**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**EDWARD MELBER,**

                              **Plaintiff,**

**v.**

                                                      **21-CV-01079-JLS-HKS**

**THERMO FISHER SCIENTIFIC,**

                              **Defendant.**

_____

## REPORT, RECOMMENDATION & ORDER

            This case was referred to the undersigned by the Hon. John L. Sinatra, Jr., pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #10.

            This is an employment discrimination action in which plaintiff alleges that defendant terminated his employment because of his age, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*[1]

            Currently before the Court is defendant's motion for summary judgment, Dkt. #47, and plaintiff's cross-motion for summary judgment. Dkt. #49.

_____

[1] Plaintiff also alleged a claim under New York Labor Law § 740(2)(c), but the Court dismissed it as untimely. Dkt. ##17, 24.

## BACKGROUND

### Compliance with Rule 56(c) and Loc. R. Civ. P. 56(a)(2)

Before discussing the facts of this case, the Court must address an important procedural matter.

Rule 56 of the Federal Rules of Civil Procedure states that, on summary judgment, a party asserting that a fact cannot be, or is, genuinely disputed "must" support that assertion by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). This rule further provides that if a party fails to comply with that requirement, the court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

This concept is embodied in the Court's local rules. Loc. R. Civ. P. 56(a) requires a party moving for summary judgment to attach a statement, containing numbered paragraphs, of the material facts that it contends are undisputed with specific citations to the record. The rule further states:

> The papers opposing a motion for summary judgment **shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs** and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried. **Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement**.

Loc. R. Civ. P. 56(a)(2) (emphasis added).

Such rules are neither ambiguous nor without purpose. *See, e.g., Shaoxing Chenyee Textile Co. Ltd. v. Louise Paris Ltd.*, 1:23-cv-6755, 2024 WL 3347036, at *3 (S.D.N.Y. July 8, 2024) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.") (citation omitted); *New York State Teamsters Conf. Pension and Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005) (noting that local rules governing summary judgment practice are "essential tools for district courts, permitting them to efficiently decide summary judgment motions").

In *Moore v. Am. Fed. of State, Cnty. and Mun. Emps. Local 1095*, No. 22-1123-cv, 2023 WL 4145004 (2d Cir. June 23, 2023), the Second Circuit affirmed this Court's ruling that a plaintiff's failure to submit an opposing statement to a defendant's Rule 56 statement of undisputed facts was grounds for deeming the asserted facts admitted, thereby foreclosing—as a matter of law—plaintiff's race-discrimination claim against that defendant. *Id.* at *2. *See also Ott v. Gonzalez*, Case No. 1:20-cv-497, 2022 WL 17957297, at *1 (W.D.N.Y. Dec. 27, 2022) (deeming as admitted defendant's statement of undisputed facts where plaintiff did not counter them as required by Rule 56(c) and Loc. R. Civ. P. 56).

The Second Circuit has recently reaffirmed that district courts may strictly enforce these rules. *RainMakers Partners LLC v. NewSpring Cap., LLC*, 23-899, 2023 WL 1846321, at *2 (2d Cir. April 29, 2024) (district court was entitled to deem admitted a fact asserted in movant's Rule 56 statement of undisputed facts where non-movant disputed the fact but failed to cite any evidentiary support).

Here, defendant attached to its motion for summary judgment a "Rule 56 and Local Rule 56(a)(1) Statement of Material Facts As To Which No Genuine Issue Exists." Dkt. #47-2. This statement contains 150 paragraphs and cites to record evidence, including deposition testimony, affidavits, and documents. *Id.*

Plaintiff's response to defendant's motion—which is also styled as a cross-motion for summary judgment—is not accompanied by a counter-statement of facts as required by the above rules. Dkt. #49. Although defendant noted this deficiency in its reply brief, arguing that its statement of facts should be deemed admitted, Dkt. #53, pp. 13-16, plaintiff failed to address the issue in his own reply brief filed two weeks later. Dkt. #54.

Moreover, as defendant notes, plaintiff's counsel was also counsel for the plaintiffs in *Moore* and *Ott*. The Court thus concludes that plaintiff's failure to comply in this case, or to attempt to explain that noncompliance, is not a mere oversight.

The Court will therefore deem admitted the facts set forth in defendant's statement of material facts for purposes of the instant motions where those facts are

supported by admissible evidence in the record. *New York State Teamsters*, 426 F.3d at 649.

### Plaintiff's Employment History with Defendant

Plaintiff Edward Melber began employment with Life Technologies Corporation on January 25, 2010, in the position of Engineer III in the liquid manufacturing area at the company's facility in Grand Island, New York. Dkt. #47-3, pp. 9-11, 126-127. Plaintiff, who was born in 1964, was 45 years old at that time. Dkt. #47-3, p. 8.

On February 3, 2014, defendant Thermo Fisher Scientific acquired Life Technologies, including the Grand Island facility. Dkt. #47-4, ¶ 4. Plaintiff thus became employed by Thermo Fisher in the same Engineer III position, and he was always assigned to the liquid manufacturing area. Dkt. #47-3, pp. 11, 13, 85-87.[2]

Plaintiff's responsibilities included supporting the liquid manufacturing area; selecting and validating equipment; and performing testing and analyzing the results. Dkt. #47-3, pp. 11-12. Plaintiff was also responsible for the investigation and resolution of Problem Records ("PRs") and implementing quality and safety-related Corrective and Preventative Actions ("CAPAs"). Dkt. #47-3, pp. 12, 85-87.

---

[2] The Grand Island facility consisted of three primary manufacturing areas: (1) powder manufacturing; (2) liquid manufacturing; and (3) large volume liquid manufacturing, a new facility expansion which, as of 2015-2016, had not been released for manufacturing. Dkt. #47-5, ¶ 6.

A PR refers to a report regarding nonconforming material, deviations, audits, audit observations, aged inventory, complaints, preventative actions, or effectiveness checks. Dkt. #47-5, p. 9. Plaintiff testified that a PR was created when something "went wrong" on the production floor, whether due to mechanical or human error. Dkt. #47-3, p. 12.

In contrast, a CAPA was a larger recurrent issue relating to quality or safety in the manufacturing process. Dkt. #47-3, pp. 12-13; Dkt. #47-5, ¶ 12.

Once a PR or CAPA was assigned by the Quality Department to a Manufacturing Engineer, the engineer was expected to investigate the problem, record notes on the investigation's status in a computer system called "TrackWise," and document in TrackWise when the matter was resolved. Dkt. #47-3, pp. 12-13; Dkt. #47-5, ¶¶ 15, 17, 18.

All PRs and CAPAs were initially set for a 30-day closure date, but the assigned Manufacturing Engineer could request an extension from the assigning Quality Engineer, and such extensions were regularly granted. Dkt. #47-5, ¶¶ 14-17.

Because Thermo Fisher was an FDA-regulated facility, its failure to properly manage and resolve PRs and CAPAs could violate the company's regulatory compliance. Dkt. #47-5, ¶ 9. The company regularly circulated open PR and CAPA reports to achieve compliance with the deadlines. Dkt. #47-3, pp. 133-142. In addition, all employees in the

Manufacturing Engineering and Quality Departments were evaluated on their timely review and resolution of PRs and CAPAs. Dkt. #47-5, ¶ 19.

### *Plaintiff's Performance Reviews*

### <u>2012 and 2013</u>

In 2012 and 2013—prior to Life Technologies' acquisition by Thermo Fisher—plaintiff reported to Lisa Paine ("Paine"), Manufacturing Engineering Manager. Dkt. #47-3, pp. 11, 126-127. Paine was born in 1959 and was thus 4-5 years older than plaintiff. Dkt. #47-3, p. 17; #47-4, ¶ 8.

In 2012, Paine conducted a mid-year review of plaintiff's performance. Dkt. #47-3, pp. 144-147. Paine noted that the Manufacturing Engineers carry the most open PRs due to floor support issues, and she stated: "Ed has been asked to manage floor support issues with a greater sense of urgency to decrease downtime in Liquid Finish and drive schedule attainment numbers up." Dkt. #47-3, p. 144.

Paine also conducted a year-end review of plaintiff's performance for 2012. Dkt. #47-3, pp. 149-156. She noted that: "Overall, 2012 was a good period for Ed" and that he had increased his focus on closing PRs, and she stated as goals for 2013: "Be more proactive and create better CAPA with effectiveness checks to resolve recurring issues;" "Drive actions and equipment purchases with supporting data;" and "Promote and communicate individual and Team Manufacturing Engineering results among Technicians, Peers, and Upper Management." Dkt. #47-3, pp. 153-154. Plaintiff testified

that he did not think that this review was discriminatory towards him because of his age. Dkt. #47-3, p. 17.

Paine also conducted two performance reviews of plaintiff for 2013. In the mid-year review, Paine noted plaintiff's strong mechanical abilities and stated that all engineers needed to review their workload to assure priorities were aligned with site goals. Dkt. #47-3, p. 158. Similarly, in the year-end review, Paine stated that plaintiff had a productive year but he "needs to continue to develop his project management skills to provide timelines on all projects." Dkt. #47-3, p. 164.

## 2014 and 2015

In 2014, after Paine transferred to a different position, Scott Verner ("Verner") became plaintiff's supervisor. Dkt. #47-3, p. 16. In plaintiff's 2014 mid-year review, Verner stated that plaintiff had completed a number of process improvements during the year, but that he would like to see plaintiff "become more rigorous when it comes to project management." Dkt. #47-3, p. 171. Verner noted this was important because the operation was growing, and it would be "undertaking many more large scale multi-month projects that will require a very formal approach to cost and timeline management." *Id.* Verner also stated that while plaintiff was good at identifying opportunities, "timing of his efforts is usually behind schedule," and his "management skills need to be better demonstrated and utilized, especially if he wants to continue moving up into the more senior levels of Engineering." Dkt. #47-3, p. 172.

Verner also completed plaintiff's 2014 year-end review. Verner noted plaintiff's eye for productivity and energy, but commented:

> I'd still like to see Ed put more rigor around project management and establishing a solid plan with deliverables and milestones. As he progresses in the Engineering role, he'll be asked to take on larger scale, more complex projects and success will be dependent on managing activities to tight timelines and costs to tight budgets. I urge Ed to become familiar with the use of simple Gannt charts and project plans.

Dkt. #47-3, pp. 182-183.

Verner further noted:

> Ed needs to consider the work he has in front of him and work to prioritize the activities appropriately, asking me when conflicts arise. Process improvement projects, NPI, and CAPA/PR are all important work, but when resources are tight, we must make decisions to table certain activities. I feel like Ed has some difficulty in this area and wants to continue his improvement projects at the expense of more critical activities. He and I discussed this a few times in 2014 and I will continue to work with him on it, but I would like to see him take a more proactive role.

Dkt. #47-3, p. 183.

Finally, Verner noted that plaintiff needed to "continue working toward zero past due PR/CAPA" and to improve his PR investigations and documentation. *Id.*

Plaintiff testified that he did not think that Verner—who was in his mid-40s—was treating him differently because of his age in giving these reviews. Dkt. #47-3, pp. 20-21; Dkt. #47-4, ¶ 9.

Verner also completed plaintiff's 2015 mid-year performance review. Verner stated:

> Ed is the most prolific engineer when it comes to JDI projects. He has a very good eye for waste and does a terrific job developing engineering solutions. He has been recognized numerous times by the PPI team for his projects and continues to excel in this area. In addition, he has done a good job of keeping all of his PR, CAPA, and Effectivity Checks up to date.

Dkt. #47-3, p. 186.

Verner also acknowledged plaintiff's aspiration to become a Staff Engineer. Dkt. #47-3, pp. 186-187. Verner encouraged plaintiff to review the requirements of a Staff Engineer and "to broaden his process knowledge and begin working with other liquid engineers on the Formulation and Filtration operations, so that he can represent all aspects of the manufacturing process in audits, technical visits, and serve as a mentor for other engineers." Dkt. #47-3, p. 187.

After Verner left Thermo Fisher in August 2015, plaintiff reported briefly to Martin Schaefer ("Schaefer"), then a Senior Manager in Manufacturing, who was in his mid-40s. Dkt. #47-3, p. 22; Dkt. #47-4, ¶ 10.

***2016: Paul Clark Becomes Plaintiff's Supervisor***

In January 2016, Paul Clark ("Clark")—who had been with Thermo Fisher's predecessor companies since 2006—was promoted to Senior Manager in Manufacturing, overlapping with Schaefer's role. Dkt. #473, pp. 63-64; Dkt. #47-5, ¶ 21. Although plaintiff and Clark had both worked at the Grand Island facility, plaintiff testified that he did not know Clark prior to 2016.  Dkt. #47-3, p. 19.[3]

Plaintiff testified that he had previously expressed interest in the Senior Manager in Manufacturing position to the Plant Manager—prior to it being awarded to Clark—but he never officially applied for it. Dkt. #47-3, pp. 19-20. Nonetheless, he was "disappointed" that he was not selected. *Id.*

In the spring of 2016, Schaefer issued plaintiff his 2015 year-end review, and Clark sat in on the meeting. Dkt. #47-3, p. 23.[4] Schaefer told plaintiff that Clark was going to be the new supervisor. Dkt. #47-3, pp. 23-24.

In this review, Schaefer noted:

> Ed had a strong year with a wide range of Just Do It (JDI) contributions for those he directly identified and implemented as well as those he supported to ensure the improvement was submitted to the JDI tracking mechanism and completion. In aggregate his contributions enabled him to meet the following 2015 goals . . . . Specifically, Ed's contributions led to numerous, significant improvements that will have lasting impact within liquid manufacturing. . . Ed is a creative and

---

[3] From February 3, 2014 to December 31, 2016, the Grand Island facility had approximately 690 employees. Dkt. #47-4, ¶ 7.

[4] Clark testified that this meeting occurred in approximately March of 2016. Dkt. #49-4, p. 26.

driven engineer consistently looking to improve processes and eliminate waste, which is evident by the high number of JDIs submitted.

Dkt. #47-3, p. 194.

Schaefer also noted, however, that plaintiff had at least 26 late PRs and that he "needs to take full [responsibility] for his PRs and managing the data . . ., proactively adjusting dates when warranted." Dkt. #47-3, p. 194. Schaefer further stated: "Ed needs to improve the proactive approach of engaging quality earlier in the PR process to prevent having discussion with quality for additional information at the last minute, resulting in late PR closure." *Id.* Schaefer also noted plaintiff's interest in a Staff Engineer position, stating that plaintiff "needs to grow as an effective leader." Dkt. #47-3, p. 195.

Based on this review, plaintiff received a raise and bonus for 2015. Dkt. #49-4, p. 41.

Schaefer left Thermo Fisher on April 15, 2016 to take a job at another company, and Clark then became plaintiff's supervisor. Dkt. #47-3, p. 23; Dkt. #47-4, ¶ 10; Dkt. #47-3, p. 66. Clark was 39 years old at that time, and plaintiff was 51 years old.[5]

---

[5] Defendant's Rule 56 statement of facts states that Clark was 38 years old at the time, but this appears to be a typographical error, as the record is clear that Clark was born in 1976. Dkt. #47-2, ¶ 75; Dkt. #47-4, ¶ 11.

Plaintiff testified that, from the time that Clark became his supervisor, he felt that Clark was dissatisfied with everything he did and that "he had a target on his back." Dkt. #47-3, p. 45. He testified that Clark gave him an overload of projects; had unreasonable expectations; increased his workload and timelines to an "impossible" level; withheld resources; and asked plaintiff to perform a machinery validation that plaintiff was not qualified to do. Dkt. #47-3, pp. 26-28.

Plaintiff told Paine that he felt that he had a "target on his back," and Paine said he did not, it was that Clark was "getting pressure from above to get things done." Dkt. #47-3, p. 28.

Plaintiff and Clark began having one-on-one meetings to address upcoming projects, deadlines, PRs, CAPAs, and Clark's concerns regarding plaintiff's prioritization and communication with his peers and managers. Dkt. #47-3, p. 27; Dkt. #47-5, ¶ 23. Plaintiff kept logs of these meetings and the work he was doing. Dkt. #47-3, p. 27. The logs reflect that plaintiff and Clark met on May 26, 2016; June 9 and 22, 2016; August 3 and 15, 2016; and September 2, 16, and 28, 2016. Dkt. #47-3, pp. 210-217.

When asked if Clark ever said anything derogatory to him related to his age, plaintiff testified that Clark once commented on plaintiff's need to put on his reading glasses. Dkt. #47-3, p. 28. Plaintiff characterized this as a "passing comment." Dkt. #47-3, p. 29.

## Clark Places Plaintiff on a PIP

On August 15, 2016, in a meeting with Clark and the Vice-President of Human Resources, Catherine Irish ("Irish"), Clark placed plaintiff on a Performance Improvement Plan ("PIP"). Dkt. #47-3, pp. 32-33, 129-131. The PIP noted various areas in which Clark found plaintiff's performance not to be meeting expectations:

- "You have not been able to properly prioritize, build Gantt charts and communicate timelines to stakeholders on key projects such as the Watson Marlow pumps for the 3K tank," and he "missed the last two deadlines set for this project and do not currently have a project due date.";

- "You were more than 2 weeks late in closing a Safety CAPA and have 3 PR's that would have been late before August 15th that were not delegated before you left for vacation. In addition, you have DCO1101759 that has been waiting for your approval for more than 45 days.";

- "You have failed to help others in areas that are actually your responsibility, such as submitting a Capital Request for Onova Changeparts. As a Manufacturing Engineer III you need to take active ownership of your areas of responsibility, including driving projects forward and not hindering them as you have.";

- "In addition, your interpersonal interactions with cross-functional groups including Maintenance, Liquid Manufacturing and Planning are unprofessional, sarcastic and adversarial. You regularly withhold information and when you do share information it is presented with poor professionalism, such as laughing at the recipient and then presenting a curt response followed by "I have actual work to do now."; and

- "The UDI Project has now slipped to September 10th and is at risk of not be[ing] completed prior to the deadline of September 24th."

Dkt. #47-3, p. 129. The PIP stated that "previous discussions" about these concerns had occurred during plaintiff's 2015 Year End Review and on May 25th, June 8th, and August 3rd. *Id.*

Clark's references to plaintiff's "unprofessionalism" pertained to his interactions with two other employees. The first was Jay Buckingham ("Buckingham"), a former Senior Manager in Manufacturing in his early 40s who believed that plaintiff laughed at him during a meeting when Buckingham asked plaintiff about the status of a project. Dkt. #47-5, ¶ 26; Dkt. #47-5, p. 27; Dkt. #47-3, pp. 30-31; Dkt. #47-4, ¶ 14.

The second was Jennifer Dudgeon, a Manufacturing Planning manager, then aged 46 or 47,[6] who asked plaintiff about a project status, and plaintiff allegedly rudely responded and walked away saying, "I have actual work to do now." Dkt. #47-5, ¶ 28; Dkt. #47-5, p. 27.

Clark testified that both Buckingham and Dudgeon complained to him about "the negative interactions" with plaintiff. Dkt. #47-5, ¶ 30. Clark reported these incidents to Human Resources in an email on August 9, 2016, Dkt. #47-5, p. 27—six days before placing plaintiff on the PIP—and he directed plaintiff to apologize to both Buckingham and Dudgeon.

---

[6] Defendant's statement of undisputed facts states that Dudgeon was then 56, but this appears to be a mistake because she was born in 1969. Dkt. #47-4, ¶ 14.

Plaintiff testified that Buckingham was mistaken in thinking that he laughed at him during the meeting in question. Dkt. #47-3, p. 30. He also testified that his remark to Dudgeon was taken out of context and that when he apologized to her, she did not even remember the incident. Dkt. #47-3, p. 31.

Clark testified that on another occasion, he saw Buckingham ask plaintiff for an update on a pump project, and that plaintiff was very "curt," gave Buckingham little information, and then plaintiff "stormed off" saying he had "actual work to do." Dkt. #47-3, p. 69.

The PIP also contained a section outlining specific objectives, and it set deadlines for five different projects, ranging from September 5, 2016 to September 20, 2016. Dkt. #47-3, p. 130. Plaintiff testified that meeting deadlines for five major projects within a two-week period was "impossible." Dkt. #47-3, p. 33.

Clark further stated in the PIP that, as a senior level engineer, plaintiff was required to demonstrate professionalism; he was responsible for effectively managing priorities; and it was unacceptable for him to have past due PRs and CAPAs. Dkt. #47-3, p. 131.

The PIP contained a section at the end for "Employee Comments," to which plaintiff submitted an eight-page document a few days later. Dkt. #47-3, pp. 33-34, 219-226. Plaintiff stated that he was "surprised but not stunned" at receiving the PIP because

"[s]ince starting to work for Paul, I have had the feeling that he was targeting me to remove me from the company." Dkt. #47-3, p. 219. He also noted that the first date listed as a previous discussion regarding the concerns listed in the PIP was his 2015 year-end review, which was the first time Clark ever interacted with plaintiff; that Clark had not supervised him in 2015; and that the 2015 review was generally good. *Id.*

Plaintiff then addressed the concerns raised in the PIP, including the incidents with Buckingham and Dudgeon, Clark's criticism of his performance, and feedback from his colleagues, which Clark had suggested plaintiff solicit. Plaintiff listed fourteen co-workers to whom he spoke, and he testified that none of those individuals said they felt he was unprofessional and that they said that Clark had never asked them about plaintiff. Dkt. #47-3, p. 36. Overall, plaintiff disagreed with Clark's assessment of his handling of various projects, and he gave detailed explanations as to why. He again stated that he felt Clark was "targeting" him, and that, "It is hard to believe that given the below accomplishments/successes after 6 plus years of major contributions, my new supervisor has deemed me in need of a PIP after 5 months." Dkt. #47-3, p. 224.

## Plaintiff's Final Review and Termination

Approximately one month later, Clark gave plaintiff his 2016 mid-year review. Dkt. #47-3, pp. 170, 228-236.[7] Clark stated: "Since communicating the Performance Improvement Plan[,] I have not directly observed Ed having any

---

[7] This evaluation does not appear to be dated, but Clark's comments state, "Ed has been on a Performance Improvement Plan for the past 30 days," so the review would appear to have been completed in mid-September 2016.

unprofessional interactions." Dkt. #47-3, p. 231.  Clark then discussed a pump project that was past deadline, and he stated: "Overall, I do not feel that Ed's current ability to take on a project, provide a scope and drive the project meets my expectations." Dkt. #47-3, p. 232. Clark also expressed concerns about "occasional" overdue PRs and CAPAs. *Id.*

On October 4, 2016, plaintiff emailed Clark requesting that events that occurred outside the period from January 1-June 30, 2016—including discussion of the PIP—be removed from his mid-year review. Dkt. #47-3, p. 238-239. Clark responded on October 6, stating that he felt it was important to include the cited items to give plaintiff direction and that they "are critical to your success during the next 6 months." Dkt. #47-3, p. 238. On October 14, 2016, plaintiff replied by email stating that he "respectfully disagreed" and concluding: "I guess at this point we can agree to disagree." *Id.*

On October 20, 2016, Clark and Irish met with plaintiff to provide a progress review on his PIP. The review, completed by Clark, was dated October 7, 2016, almost two weeks before the meeting and one day after Clark's email of October 6, 2016, in which he discussed items "critical to [plaintiff's] success during the next 6 months." Dkt. #47-3, p. 241.

The PIP review stated that plaintiff had failed to correct the performance deficiencies listed in its four categories. Dkt. #47-3, pp. 241-242. In the fourth category— "acting in a rude and unprofessional way to internal customers"—Clark stated that during

a project meeting on September 30, he asked plaintiff, "Do you want to be part of this process or not," and plaintiff responded, "No, I really don't". Dkt. #47-3, p. 242.

As support for this alleged statement by plaintiff, defendant cites—in its Rule 56 statement—plaintiff's deposition transcript at page 221, lines 2-16. Dkt. #47-2, ¶ 114. However, that page contains no such testimony, and—as far as the Court can tell—neither does the balance of plaintiff's deposition.

At the end of the PIP review meeting, plaintiff was told that he was fired. Dkt. #47-3, pp. 38, 42, 245-247; Dkt. #47-4, ¶ 15; Dkt. #47-5, ¶ 32. At that time, plaintiff was 52 years old, and Clark was 40 years old. Dkt. #47-3, p. 8; Dkt. #47-4, ¶ 16; Dkt. #47-5, ¶ 33.

On March 13, 2017, Thermo Fisher hired Brian Edward Belmont ("Belmont"), age 33 years old, as an Engineer III to fill plaintiff's position. Dkt. #47-4, ¶¶ 26-27; Dkt. #47-5, ¶ 34.

On April 6, 2017, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that defendant discriminated against him based on his age in violation of the ADEA. Dkt. #47-3, p. 80. Plaintiff also alleged that Thermo Fisher "has a history of getting rid of older employees and replacing them with individuals under the age of 40." *Id.*

On October 5, 2020, the EEOC issued a Determination stating:

> Statistical analysis shows that difference in the percentage of employees in the protected age group (PAG) involuntarily terminated and the percentage [of] non-PAG employees involuntarily terminated for the same reasons is large enough that the difference cannot be explained by chance. Lastly, witness testimony supports evidence of a discriminatory animus based on age.
>
> Based on the above, Respondent's asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Party and others based on their age.

Dkt. #47-3, pp. 82-83.

Plaintiff filed this action on October 1, 2021. Dkt. #1.

## DISCUSSION AND ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

**<u>Age Discrimination</u>**

The burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs claims under the ADEA. *Osinoff v. Nuvance Health*, No. 22-CV-2017 (KMK), 2024 WL 967190, at *8 (S.D.N.Y. Mar. 5, 2024) (citations omitted).

The plaintiff must first establish a prima facie case of age discrimination by showing that: (1) he is a member of the protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Id.* (citation omitted).

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment." *Id.* (citation omitted). "If such a reason is proffered, the burden shifts back to the plaintiff to prove that [ ] the employer's reason was a pretext—in other words, to prove that discrimination was the real reason for the employment action." *Id.* (citation and internal quotation marks omitted).

"The Second Circuit has stated repeatedly that an extra measure of caution is merited before granting. . .summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." *Id.* (citations and internal quotation marks omitted). "Because discriminatory intent is elusive in nature, . . .affidavits and depositions

must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.*

"That said, a plaintiff's reliance upon conclusory statements or mere allegations will not suffice to defeat summary judgment." *Id.* "Summary judgment remains proper when the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*

### *Prima Facie Case*[8]

Defendant concedes that plaintiff satisfies the first and third elements of the prima facie case because he was over forty years old at the time his employment was terminated, and such termination constitutes an adverse employment action. Dkt. #47-1, p. 13.

Defendant argues, however, that plaintiff cannot show that he was qualified for the Engineer III position due to the performance issues for which he was allegedly fired. Dkt. #47-1, p. 13. This misstates the law.

---

[8] The Court notes that, in addition to the Rule 56 issues discussed above, plaintiff's cross-motion for summary judgment also runs afoul of applicable rules. Dkt. #53, pp. 28-34. These deficiencies include: the cross-motion was filed nearly a month after the dispositive motion deadline set by the Court; it is unaccompanied by the required Rule 56 statement of facts or a memorandum of law; and the attorney affirmation is substantively improper.

The Court will thus not separately analyze plaintiff's cross-motion, but it notes that even if it did, the Court's recommendation would be the same. That is, the record is rife with genuine disputes of material fact precluding summary judgment for either party.

The Court also reminds plaintiff's counsel of his obligation to comply with the civil and local rules.

To satisfy the "qualified" element of the prima facie case, a plaintiff need only make the "minimal" showing that he "possesses the basic skills necessary for performance of [the] job." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (citation and internal quotation marks omitted). This is because the "qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Id.*

Here, drawing all factual inferences in plaintiff's favor, he easily meets the "basic skills" test. He was employed by defendant for more than six years and, despite the reasons proffered by Clark for firing him, he clearly possessed the ability to perform his job, as reflected on his pre-2016 performance reviews. *See, e.g., Kelepecz v. Children's Learning Ctrs. of Fairfield Cnty., Inc.*, CASE No. 3:21-cv-135 (OAW), 2024 WL 1141821, at *7 (D. Conn. Mar. 15, 2024) (discussing *Slattery* and rejecting defendant's argument that plaintiff could not satisfy "qualification" element because she could not show "satisfactory performance;" plaintiff held her position for eleven years and evidence showed she possessed at least the basic skills to perform it, notwithstanding alleged performance reasons for termination); *Verne v. New York City Dep't of Educ.*, 697 F. Supp.3d 30, 45 (S.D.N.Y. 2023) (refusing to consider plaintiff's alleged performance issues at the prima facie stage; plaintiff worked as teacher for defendant for many years during which she had adequate performance reviews, and plaintiff alleged that alleged performance issues were pretext for age discrimination).

Defendant also argues that plaintiff cannot satisfy the fourth element of the prima facie case by showing that he was terminated under circumstances that give rise to an inference of discrimination. Dkt. #47-1, pp. 13-14. The Court disagrees.

It bears noting that the burden of establishing the prima case of age discrimination is "minimal." *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) (citation omitted).

Moreover, "an inference of discrimination also arises when an employer replaces a terminated . . . employee with an individual outside the employee's protected class." *Id.* at 312-13 (citations omitted).

It is not disputed that plaintiff was replaced by an individual who was approximately twenty years younger and outside the protected class. This "will ordinarily suffice for the required inference of discrimination as the initial prima facie stage." *Id.* at 313. *See also Dobbins v. Am. Red Cross*, Case # 12-CV-6364-FPG, 2017 WL 1046750, at *6 (W.D.N.Y. Mar. 20, 2017) (the fact that plaintiff was replaced by a "substantially younger" person supports an inference of age discrimination) (citation omitted).

Furthermore, at the prima facie stage, a plaintiff "also may create a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give

rise to an inference of discrimination." *Osinoff*, 2024 WL 967190, at *8 (citation and internal quotation marks omitted).

As will be discussed in the following section regarding pretext, the Court concludes that there is sufficient circumstantial evidence which would not only satisfy the showing of intent at the prima facie stage, but which also creates genuine issues of fact as to whether defendant's stated reasons for firing plaintiff were a pretext for age discrimination. *See Verne*, 697 F. Supp.3d at 46 (noting that "a plaintiff who can prevail at the third stage of the *McDonnell Douglas* process has necessarily demonstrated circumstances giving rise to an inference of discrimination") (citation and internal quotation marks omitted).

### Legitimate, Nondiscriminatory Reason and Pretext

Defendant has met its burden of production under *McDonnell Douglas* by stating a legitimate, nondiscriminatory reason for plaintiff's termination: poor performance. *See id.* (alleged poor performance is a legitimate nondiscriminatory reason for adverse action).

The burden thus shifts to plaintiff to present facts which, construed in his favor, show that a triable issue exists as to whether his age was a "but for" cause of his termination. *Id.* at 47. In this analysis, the "Court evaluates the proffered evidence as a whole[,] rather than in a piecemeal fashion." *Id.* (citation and internal quotation marks omitted).

***Plaintiff's Performance Reviews***

Defendant first argues that there is no evidence of pretext in Clark's decision to fire plaintiff because plaintiff's previous supervisors had found similar faults in his performance. Dkt. #47-1, pp. 15-17. This oversimplifies the record.

Plaintiff's performance reviews from the approximately four years before he began reporting to Clark—from three different supervisors—do not contain anything approaching the harsh degree of criticism levelled against him by Clark. In fact, while those reviews identify areas for improvement and, in cases, urge plaintiff to improve his management skills and his handling of PRs and CAPAs, they also contain very positive feedback regarding his performance.

For example, in 2012 and 2013, Paine noted that it was a "good period" for plaintiff; he had strong mechanical abilities; and he had a "productive year." Dkt. #47-3, pp. 153-154, 158, 164.

In 2014, Verner noted that plaintiff had completed process improvements and had "an eye" for productivity and energy, but he stated that plaintiff should become more rigorous in managing and prioritizing projects. Dkt. #47-3, pp. 171, 182-183. In 2015, Verner praised plaintiff for being "the most prolific engineer when it comes to JDI projects;" noted that he "has a very good eye for waste and does a terrific job developing engineering solutions;" noted that he had been recognized numerous times for his

projects and "continues to excel" in this area; and he had done a "good job" of keeping his PRs and CAPAs up to date. Dkt. #47-3, p. 186.

In March of 2016—seven months before Clark fired plaintiff—Schaefer stated in plaintiff's 2015 year-end review that he "had a strong year;" that his "contributions led to numerous, significant improvements that will have lasting impact within liquid manufacturing; and that he was "a creative and driven engineer consistently looking to improve processes and eliminate waste." Dkt. #47-3, p. 194. Schaefer also noted, however, that plaintiff had overdue PRs and needed to improve his approach to keeping them timely. Dkt. #47-3, p. 195. Nonetheless, based on this review, plaintiff received a raise and bonus for 2015. Dkt. #49-4, p. 41.

Further, while some of the pre-2016 reviews questioned plaintiff's readiness for promotion, none suggested that his job was in jeopardy. And even considering the constructive criticism contained in those reviews, their tenor stands in sharp contrast to plaintiff's testimony regarding his treatment by Clark: that he felt that he had a target on his back and that Clark overloaded him with projects, had unreasonable expectations, and withheld resources plaintiff needed to complete projects.

Of course, there is also evidence that Clark found plaintiff's performance to be unsatisfactory, and that plaintiff pushed back at Clark's criticisms. But such differing interpretations of the facts creates a genuine dispute that the Court may not resolve on summary judgment. *See Muniz v. City of New York*, 20 Civ. 9223 (JPC), 2023 WL

62494169, *13 (S.D.N.Y. Sept. 27, 2023) ("Certainly, it may be that Mastronardi's difficulties with Muniz were legitimate and entirely unrelated to Muniz's age or race. But given the contradictory evidentiary record before the Court, it is the role of the jury to make that determination.").

In *Muniz*, the court denied summary judgment to defendant on plaintiff's age discrimination claim based, in part, on the fact that plaintiff's previous supervisors gave him generally positive reviews. *Id.* at *12-13. The court observed:

> But the question at present is not whether Muniz has conclusively proved that Mastronardi's reasons for the transfer were pretextual, only whether Muniz has produced sufficient evidence for a finder of fact to determine that they were. Mastronardi's previous positive comments about Muniz's work, **as well as Muniz's consistently strong performance reviews in the past, are sufficient to raise a question of fact as to why Mastronardi began having problems with Muniz's work and why he would not have agreed with a strong performance evaluation. In other words, Muniz has produced evidence that his actual performance was strong, which is sufficient to create a question of fact with respect to whether Mastronardi actually thought Muniz's performance was deficient or whether Mastronardi made such assessments with discriminatory intent.**

*Id.* at *12, n.15 (emphasis added).

### The PIP, Timing Oddities, and Other Evidence

The Court also concludes that the facts surrounding plaintiff's placement on the PIP and related evidence create triable issues as to Clark's intent.

Just five months after Schaefer's largely positive 2015 year-end review of plaintiff, Clark placed plaintiff on the PIP. Viewing the record in plaintiff's favor, this seems rather abrupt, and a reasonable jury could find that Clark was "record building" to lay the foundation for plaintiff's removal.

First, the PIP cites sweeping alleged long-term performance deficiencies, which a reasonable person might find odd given that Clark had only been supervising plaintiff for four months.

Second, plaintiff testified that the narrow window of time Clark set for plaintiff to complete five major projects was "impossible." Dkt. #47-3, p. 33. In his deposition, Clark disagreed with this assessment, Dkt. #49-4, p. 77, but the Court must view the record in plaintiff's favor, and a reasonable jury could conclude that Clark was setting plaintiff up for failure. *See Verne*, 697 F. Supp.3d at 50 (summary judgment denied on age discrimination because, in part, because "a reasonable factfinder could credit plaintiff's contention that [PIP] was unachievable and thus put in place to ensure she failed").

Third, the evidence of the "unprofessionalism" mentioned in the PIP raises concerns. Clark sent Human Resources an email titled "Documentation of Issues" on August 9, 2016—six days before giving plaintiff the PIP—with paragraphs titled "Example #1," "Example #2," and Example #3. Dkt. #47-5, p. 27. The first and second examples pertain to the alleged incidents with plaintiff and Buckingham and Dudgeon, which were later referenced in the PIP.

A reasonable person might infer from this email that Clark had previously indicated an intention to take some sort of negative action against plaintiff, and Human Resources had asked for "examples" to support such action before approving it.

In addition, plaintiff testified that when he apologized to Dudgeon, as directed by Clark, she did not even remember the incident in question. Dkt. #47-, p. 31. From this, a reasonable factfinder might infer that Clark had exaggerated the alleged incident as fodder for the PIP.

Next, while plaintiff gave a lengthy, and arguably defensive, response to the PIP, it does not appear that Clark acknowledged it or reviewed the PIP in light of plaintiff's comments. Instead, in mid-September—while plaintiff was still on the PIP—Clark delivered plaintiff's mid-year review, which was largely negative and stated that plaintiff was still not meeting Clark's expectations. Dkt. #47-3, pp. 228-236.

Clark and plaintiff then had an email exchange in which plaintiff questioned whether certain items were properly included in the mid-year review. In an email dated October 6, 2016, Clark stated: "I feel it is important to include the items you mention below since these are critical to your success over the next 6 months. Not making mention of these items would mean that I am not giving you direction on how to improve or where I expect you to focus during Q3 and Q4 of this year." Dkt. #47-3, p. 241.

Despite this indication that plaintiff had a continuing opportunity to improve his performance, the very next day—October 7, 2016—Clark drafted the PIP review that terminated plaintiff's employment. Dkt. #47-3, p. 241.

Viewing this evidence holistically, a reasonable jury could conclude that the PIP, rather than being an actual resource to enable plaintiff to address Clark's concerns, was simply a means to put plaintiff in a position where he could not succeed. A reasonable jury could also find that Clark had already made up his mind to fire plaintiff and was simply "going through the motions" to make that decision appear defensible.

On the other hand, a jury could find that plaintiff had been given leniency in the past in certain areas of his job; that Clark was simply more demanding and less tolerant of performance deficiencies; and/or that Clark was under pressure to improve operations. As noted, however, these are question for a jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (holding that an age discrimination "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). [9]

---

[9] This conclusion is not foreclosed by the facts deemed admitted in defendant's Rule 56 statement because the question of intent—*i.e.*, the inference to be drawn from facts—is for a jury. And while defendant asserts in its reply brief that a fact deemed admitted is that "Thermo Fisher terminated Mr. Melber's employment for legitimate, non-discriminatory performance-reasons," Dkt. #53, p. 16, that assertion is not found in its Rule 56 statement. Rather, the cited paragraphs recount the events leading up to plaintiff's termination and state that defendant decided to terminate plaintiff because of "his ongoing resistance to the criticism and performance issues addressed by Mr. Clark." Dkt. #47-2, ¶ 115. However, that "fact" is, substantively, a statement about intent, and the record contains evidence that would permit a contrary conclusion.

In addition to the above "mosaic" of circumstantial evidence, there is other evidence—viewed collectively—from which a reasonable jury could infer that plaintiff's age was a "but for" cause of his termination.

First, at the time of his termination, plaintiff was 52 years old, and Clark was 40 years old.[10] Second, it is not disputed that plaintiff was replaced by a person almost twenty years younger. *See D'Alessandro v. Arrow Pharmacy Holdings, LLC*, 3:20-CV-536 (SVN), 2023 WL 1967245, at *14 (D. Conn. Feb. 13, 2023) (holding that evidence that plaintiff was replaced by employee 23 years younger was "strongly probative of discriminatory intent" for purposes of "but-for" analysis).[11]

---

[10] The Court does not find it probative that plaintiff's previous three supervisors were over 40 years of age because there is no allegation that any of them participated in the decision to terminate plaintiff's employment.

[11] Plaintiff also argues that while he was terminated, at least in part, for his failure to complete a 3k pump project by September 2016, defendant failed to discipline a younger employee—Kevin Howard ("Howard")—who worked on the project after plaintiff's termination and did not complete it until August 2017. Dkt. #49, pp. 7-8. However, it is undisputed that Howard occupied a more junior position than plaintiff, Dkt. #53-1, passim, and thus the two are not similarly situated for purposes of this analysis. *See Ahmad v. New York City Health and Hosps. Corp.*, 20 Civ. 675 (PAE), 2021 WL 1225875, at *22 (S.D.N.Y. Mar. 31, 2021) (plaintiff, who was experienced Level II pharmacist was not similarly situated to junior pharmacists).

Furthermore, while plaintiff testified in his deposition that Clark once commented that he would wait while plaintiff put on his reading glasses, Dkt. #47-3, p. 28, the Court finds no probative value in this testimony because the comment falls in the category of "stray" remarks, and plaintiff has alleged no nexus between the comment and his termination. *Osinoff v. Nuvance Health*, No. 22-CV-2017 (KMK), 2024 WL 967190, at *12 (S.D.N.Y. Mar. 5, 2024) (citations omitted).

In sum, there is sufficient evidence for a reasonable jury to find that defendant would not have terminated plaintiff's employment but for his age. Summary judgment is therefore unwarranted.[12]

### Evidence the Court Has Not Considered

Finally, the Court will briefly mention what it has not considered in this analysis.

First, while plaintiff relies heavily on the EEOC's determination letter, Dkt. #49, *passim*, the Court has exercised its discretion not to consider that letter because it contains no legal analysis. *See Weiglein v. Nat'l Grid*, No. 11-CV-809A, 2013 WL 4718499, at *5 (W.D.N.Y. Sept. 3, 2013) ("The admissibility of an EEOC reasonable cause determination is discretionary with the district court and is dependent upon probative facts and a proper legal basis for an administrative finding.") (citation omitted).

Second, the Court has not considered the notes of interviews that the EEOC conducted with employees and former employees of defendant during its investigation, Dkt. #49-7, pp. 1-22, because they constitute hearsay. *See Lincoln v. BNSF Ry. Co.*, Case

---

[12] To the extent that plaintiff attempts to support his age discrimination claim by alleging that defendant had a pattern or practice of firing older employees, he has failed to produce admissible evidence in support of that argument because he relies almost entirely on the EEOC determination letter, discussed below, and he has not introduced any statistical evidence or expert analysis thereof. *See Cruz v. Bernstein Litowitz Berger & Grossman LLP*, 20-CV-8596 (VF), 2023 WL 2691456, at *10, (S.D.N.Y. Mar. 29, 2023) (discussing requirements for statistical evidence submitted in support of age discrimination claims).

No. 15-4936-DDC-ADM, 2020 WL 4000912, at *13 (D. Kan. July 15, 2020) (notes of EEOC investigator of interviews with defendant's employees were both hearsay and "hearsay within hearsay").

## **CONCLUSION**

For the foregoing reasons, it is recommended that defendant's motion for summary judgment (Dkt. #47) and plaintiff's cross-motion for summary judgment (Dkt. #49) be denied.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed .R. Civ. P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order</u>. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

DATED:    Buffalo, New York
          July 31, 2024

<u> s/ H. Kenneth Schroeder, Jr.</u>
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

~ 36 ~